## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JABIL, INC.,

        Plaintiff,

vs.

ESSENTIUM, INC.; ESSENTIUM
MATERIALS, LLC; ERIK GJOVIK;
GREG OJEDA; WILLIAM "TERRY"
MACNEISH, III; LARS
UFFHAUSEN; JASON GREENE;
CHAD EICHELE; STEVEN
BIRDWELL; and GENE BIRDWELL,

        Defendants.

Case No. 8:19-cv-1567-T-23SPF

## ESSENTIUM, INC., ESSENTIUM MATERIALS, LLC'S,
## BLAKE TEIPEL'S AND LARS UFFHAUSEN'S
## ANSWER TO SECOND AMENDED COMPLAINT (DOC. 90)

Essentium, Inc. and Essentium Materials, LLC (collectively, the
"**Essentium Companies**"), and Blake Teipel ("**Teipel**") and Lars Uffhausen
("**Uffhausen**") (the Essentium Companies, Teipel and Uffhausen are referred to
collectively as "**Essentium Defendants**") answer Jabil Inc.'s ("**Jabil**") Second
Amended Complaint (Doc. 90) as follows:

## General Denial

The Essentium Defendants generally deny all allegations contained in the

123683765.2

Second Amended Complaint (other than those explicitly admitted in addressing the enumerated allegations below which have been quoted in bold face type), for at least three overarching reasons.

First, Jabil's second amended complaint (as with its prior complaints) is built on a false premise – namely, its allegation that it had developed a "best-in-class FFF printer" called "TenX" through years of effort and millions of dollars in expenditures, which printer embodied valuable trade secrets that various defendants allegedly stole from Jabil. In truth, Jabil's TenX never constituted a functional 3D printer at all, much less a "best-in-class" printer that embodied any Jabil trade secrets. To the contrary:

➤ Jabil initially adopted a strategy that it promoted to the team of employees who designed or were hired to help design a printer;

➤ Jabil, however, failed to carry that strategy to a conclusion, and ended up only building four prototypes of a printer Jabil planned to complete called TenX;

➤ Those prototypes could not be and never were sold as printers, because they were never commercially viable;

➤ Jabil management elected not to invest the time, money, and other resources needed to advance beyond those four

123683765.2

prototypes to a commercialized product;

➤ Jabil management was never able to find a viable business plan for marketing a TenX printer that its management was willing to invest in;

➤ Jabil management thus abandoned its search for a marketing strategy for creating a separate company to complete and sell a completed TenX printer, and instead went in a different direction that ultimately prompted Jabil to fire its remaining hardware employees in October 2017;

➤ None of Jabil's four prototypes ever included any Jabil "trade secrets," a fact Jabil knew throughout the period from July 2016, when the idea to design a printer first emerged, through October 2017, when Jabil let its hardware design team go;

➤ Jabil's TenX prototypes were built using existing design features and off-the-shelf components from vendors known in the industry, the use of which did not constitute a trade secret or for that matter anything confidential;

➤ No customer ever ordered a TenX prototype, Jabil never produced a final commercially available TenX printer, and Jabil

3

> never received even one dollar of revenue from the TenX
> prototype or through any commercial relationship involving the
> TenX prototype; and

➢ Instead of making those prototypes available as evidence of its
  claims in this case that could be scrutinized by those purchasing
  printers in the 3D printer market, Jabil's shareholders, Jabil's
  own experts, the Essentium Defendants' experts, the Court, or
  the jury in the defense of Jabil's claims, Jabil ***destroyed*** all four
  of its TenX prototypes, cannibalizing them for their mechanical
  parts for other projects.

Second, every claim Jabil has asserted in this case is grounded in the false allegations that (i) Jabil owns valuable trade secrets embodied in the destroyed TenX prototypes, and (ii) Jabil treated its internal additive materials, printer business and marketing plans, "pitch" decks, and other documents as confidential. Jabil seeks, with this lawsuit, to intimidate its existing employees by making a public display of its prosecution of claims against former employees for keeping copies of such materials after they left Jabil.

The truth, however, is that:

➢ Jabil owned no trade secrets in its TenX prototypes;

4

➢ The Essentium Machines, LLC, Essentium Materials, LLC and Essetnium Inc., together with the former Jabil employees hired by Essentium Machines, LLC, together succeeded at independently:

    o designing a word-class printer: and

    o solving the marketing problems that Jabil's senior management chose to have Jabil stop working on before they decided to scrap the TenX printer program, fire the design team, and abandon the investment of Jabil shareholder money in the effort.

Jabil also did not take reasonable steps between 2015 and October 2017 to keep confidential the information that Jabil now alleges in its lawsuit was confidential information or trade secret protected information belonging to Jabil. For example, Jabil and its employees rarely designated any of its internal communications, business plans, and marketing documents concerning the commercialization of a high speed 3D printer as even being internally confidential, and most, if not all of those plans and documents included publicly available information. Recognizing this, Jabil wrongfully wants to make a public example out of several of its former employees who had retained backups of

information they received, sent, generated or otherwise worked on while with Jabil, not because Jabil has been damaged by them having done so, but as a means for keeping existing Jabil employees in fear of being similarly victimized by Jabil. In so doing, Jabil seeks to block its own employees from leaving Jabil and going to work for companies that might compete with Jabil for such employees.

Third, the Defendants' actions in founding or joining a start-up company whose ideas have already disrupted the 3D printer business never constituted a conspiracy to deprive Jabil of intellectual property or confidential information, if any, owned by Jabil. Essentium Materials had long been studying printers in its efforts to innovate the additive materials business, and saw promise in the direction Jabil was headed with its TenX prototype. Essentium Materials openly sought to work out a licensing arrangement with Jabil. As it was doing so, Jabil's internal conduct centered around its planning for 2018 gradually became known to MacNeish, Gjovik, and Ojeda, prompting each to realize that they likely had no future working for Jabil and would soon need to find new jobs or opportunities. Essentium Materials expressed a willingness to proceed with a start-up organization and to hire or co-found that start-up with MacNeish, Gjovik and Ojeda, even if Jabil ultimately declined to license its prototypes to Essentium Materials. Essentium Materials first hired MacNeish and created Essentium

Machines.  When Jabil thereafter chose not to license its TenX prototypes to Essentium Materials or HP, the Essentium Defendants and others invitedGjovik, and Ojeda to become founders of Essentium Machines to start the 3D printer machine design from scratch.  After Jabil fired Gjovik, Ojeda, Greene and Eichele, each of them joined Essentium Machines with the understanding and directive that all engineering activities be conducted from scratch, introducing fresh concepts and design thinking independent from the design thinking employed at Jabil, from the start of the High Speed Extrusion (HSE) project to completion.

### Jabil's Enumerated Allegations (quoted in bold face below)

**1.     This is an action for misappropriation of trade secrets and other intentional misconduct relating to Jabil's 3D printing technology.**

The Essentium Defendants admit Jabil has so characterized its allegations, but otherwise deny the allegations contained in paragraph 1.

**2.     Over the course of several years, Jabil invested millions of dollars and devoted thousands of engineering hours to developing "TenX," a fused filament fabrication printer that offers substantially more speed and flexibility than its legitimate competitors.**

The Essentium Defendants deny the allegations contained in paragraph 2.

**3.     Essentium's "High Speed Extrusion" line of 3D printers is not, however, a legitimate competitor. Rather than devoting its own resources and time to developing its own commercially viable printer, Essentium conspired with its Codefendants—a group of now- former Jabil employees—**

123683765.2

to steal highly confidential designs, vendor relationships, and other trade secrets and use them to replicate Jabil's TenX.

The Essentium Defendants deny the allegations contained in paragraph 3.

4.    Essentium's HSE printers are, foundationally, outdated iterations of Jabil's TenX. They are made by former Jabil engineers, from Jabil designs, using components sourced from vendors that Jabil identified and vetted. Indeed, in an audacious nod to the true origin of its printers, Essentium has boasted in its advertisements that its HSE printers operate at "10X" their competitors' speed.

The Essentium Defendants deny the allegations contained in paragraph 4.

5.    Jabil brings this action to prevent further misuse of its technology and to obtain compensation for Defendants' unjust enrichment from the sale of HSE printers and associated materials.

The Essentium Defendants deny the allegations contained in paragraph 5.

6.    Plaintiff, Jabil Inc., is a Delaware Corporation with its principal place of business in Florida.

The Essentium Defendants admit the allegations contained in paragraph 6.

7.    Defendant Essentium, Inc., is a Delaware Corporation with its principal place of business in Texas.

The Essentium Defendants admit the allegations contained in paragraph 7.

8.    Defendant Essentium Materials LLC is a limited liability company formed and principally operating in Texas.

The Essentium Defendants admit the allegations contained in paragraph 8.

9.    Defendant Blake Teipel is a natural person domiciled in Texas.

The Essentium Defendants admit the allegations contained in paragraph 9.

123683765.2

**10.** **Defendant Erik Gjovik is a natural person domiciled in California.**

The Essentium Defendants admit the allegations contained in paragraph 10.

**11.** **Defendant William Jack "Terry" MacNeish, III, is a natural person domiciled in California.**

The Essentium Defendants admit the allegations contained in paragraph 11.

**12.** **Defendant Lars Uffhausen is a natural person domiciled in New Jersey.**

The Essentium Defendants admit the allegations contained in paragraph 12.

**13.** **Defendant Jason Greene is a natural person domiciled in California.**

The Essentium Defendants admit the allegations contained in paragraph 13.

**14.** **Defendant Chad Eichele is a natural person domiciled in California.**

The Essentium Defendants admit the allegations contained in paragraph 14.

**15.** **Defendant Steven Birdwell is a natural person domiciled in Texas.**

123683765.2

The Essentium Defendants admit the allegations contained in paragraph

15.

**16.     Defendant Gene Birdwell is a natural person domiciled in Texas.**

The Essentium Defendants admit the allegations contained in paragraph

16.

## JURISDICTION AND VENUE

**17.     This Court has federal-question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because Defendants have violated or conspired to violate the Defend Trade Secrets Act, 18 U.S.C. § 1836, and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. This Court has supplemental jurisdiction over Jabil's state-law claims pursuant to 28 U.S.C. § 1367.**

The Essentium Defendants admit that the Court has jurisdiction over this

action but deny the remaining allegations contained in paragraph 17.

**18.     This Court has personal jurisdiction over Defendants pursuant to Section 48.193(1)(a), Florida Statutes, because Defendants committed, aided and abetted, or participated in a conspiracy to commit intentional torts in the State of Florida.**

**        a.     For instance, Defendants Gjovik and MacNeish, along with former Jabil employee Gregory Ojeda, repeatedly travelled to Jabil's headquarters in St. Petersburg, Florida, where they engaged in activities directly related to Jabil's TenX program while simultaneously concealing their efforts, and those of their coconspirators, to misappropriate and otherwise misuse Jabil's trade secrets and other highly confidential information for their own benefit. Among other acts of intentional misconduct that were committed in Florida and relate directly to the claims asserted in this Complaint, Erik Gjovik, acting on behalf of himself and his**

10

coconspirators, travelled to Jabil's St. Petersburg headquarters in August 2017, where he requested funding and other resources from Jabil's executive leadership while willfully concealing that he and his coconspirators were continually and unlawfully expending Jabil resources to create or support a direct competitor to Jabil's TenX program.

        **b.**    **Defendants Essentium, Essentium Materials, Steven Birdwell, Gene Birdwell, Teipel, Uffhausen, Greene, and Eichele conspired with and aided and abetted Gjovik, Ojeda, and MacNeish. Defendants Essentium, Essentium Materials, Steven Birdwell, Gene Birdwell, Teipel, and Uffhausen also committed independent intentionally tortious conduct, including by tortiously interfering with contracts of Jabil employees, which Defendants knew (a) provided for Florida jurisdiction and (b) would cause damage to Jabil at its headquarters in St. Petersburg, Florida.**

    The Essentium Defendants admit that the Court has personal jurisdiction

over them, but deny the remaining allegations made about them and deny or lack

knowledge or information sufficient to form a belief about the truth of the

remaining allegations contained in paragraph 18.

    **19.**    **Exercising jurisdiction over Defendants also comports with Due Process. Defendants Gjovik, MacNeish, Greene, and Eichele each consented to Florida jurisdiction in one or more contracts, including the Commitments of Confidentiality and Separation Agreements discussed below. All Defendants have committed, aided and abetted the commission of, or engaged in an ongoing conspiracy to commit intentionally tortious acts— including intentional breaches of fiduciary duties—directly aimed at and predictably damaging Jabil, which has its principal place of business and employs more than 2,000 men and women in Florida. Defendants have thus purposefully availed themselves of this Court's jurisdiction.**

    The Essentium Defendants lack knowledge or information sufficient to

form a belief about the truth of the allegations that characterize, paraphrase or

summarize the meaning or legal effect of various documents, the originals of which constitute the best evidence of their contents and which are subject to all applicable legal principles that must be considered in evaluating their legal effect. The Essentium Defendants deny the remaining allegations contained in paragraph 19.

**20.    Under 28 U.S.C. § 1391(b)(2), venue is proper in the U.S. District Court for the Middle District of Florida, Tampa Division, because a substantial part of the events or omissions giving rise to the claims in this action occurred here**.

The Essentium Defendants admit that venue is proper in this Court. The Essentium Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in paragraph 20.

## GENERAL ALLEGATIONS

I.    **Fused filament fabrication printers have historically faced substantial heating and speed hurdles.**

The Essentium Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this sentence, and therefore deny them.

21.    **This action involves additive manufacturing, a process more colloquially known as "3D printing."**

The Essentium Defendants admit the allegations in paragraph 21.

22.    **There are several ways to "print" a three-dimensional object, one of which is fused filament fabrication ("FFF").**

The Essentium Defendants admit the allegations in paragraph 22.

23.    **In general, FFF printers function by feeding material in the form of a thread-like filament through a heated extruder, which melts and deposits the material onto a horizontal platform. By moving the extruder along x-y axes during the extrusion process, the printer can deposit the material in a pattern that forms a layer of an object. Then, by lifting the extruder or lowering the horizontal platform along a z axis before repeating the extrusion process, the printer can fuse multiple layers together to fabricate a three-dimensional object.**

The Essentium Defendants admit the allegations in paragraph 23.

24.    **FFF printing technology has existed for many years, but several challenges have historically limited its commercial value. One challenge pertains to heating. If an extruder head cannot quickly heat filament to the material's desired extrusion temperature, then it cannot efficiently print 3D objects from that material. A second challenge is filament- extrusion speed. A FFF printer can only print as fast as it can drive filament through its**

extruder head. And a third challenge is motion control. Extrusion speed adds little value if a FFF printer cannot accurately and quickly extrude the material into a layered pattern. A FFF printer that can dynamically overcome these three challenges has substantial economic value in the still-developing 3D-printer market.

The Essentium Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 24 and therefore deny them.

## II. Through years of effort and millions of dollars in expenditures, Jabil developed a best-in-class FFF printer: TenX.

The Essentium Defendants deny the allegations in this sentence.

25.   In late 2014, Jabil elected to devote substantial time and resources to 3D-printing research and development.

The Essentium Defendants admit that Jabil devoted time and resources to 3D-printing research and development, but lack knowledge or information sufficient to form a belief about the remaining truth of the allegations contained in paragraph 25, which it therefore denies.

26.   Initially, Jabil intended to focus on providing services and materials that other companies could use to support and improve their existing 3D printers.

The Essentium Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 26. Therefore, denied.

27.     Through its diligence and initial efforts, however, Jabil soon determined that it could leverage its cross-industry experience to develop its own market-leading FFF printer using specialized heating components, direct-drive motors, carefully calibrated closed-loop motion control, and other highly confidential design elements. The resulting printer would substantially overcome the heating, speed, and control limitations that had historically constrained other FFF printers.

The Essentium Defendants deny or lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 27. Therefore, denied.

28.     As part of its efforts to bring this important and confidential project to fruition, Jabil added three new employees to its additive-manufacturing group: Defendant Erik Gjovik, Defendant William "Terry" MacNeish, and Gregory Ojeda. Gjovik was hired as the group's Director of Engineering Services. MacNeish was hired as its Sr. Principal Design Engineer. Ojeda was hired as the group's Business Development Manager.

The Essentium Defendants admit that Jabil hired Erik Gjovik, Greg Ojeda, and William "Terry" MacNeish to work as part of what Jabil described as its "additive manufacturing group", assigned Ojeda and MacNeish to positions bearing the described titles and assigned Gjovik to the position of "Director Engineering Services – Additive Manufacturing." The Essentium Defendants deny the remaining allegations contained in paragraph 28.

29.     Jabil later expanded its additive manufacturing group, including by hiring Defendants Jason Greene and Chad Eichele. Both were hired as an Engineer V.

The Essentium Defendants admit that Jabil hired Jason Greene and Chad

Eichele and that a document attached to the complaint identified his position as "Engr 5." The Essentium Defendants deny the remaining allegations contained in paragraph 29.

**30.    Among other compensation, Gjovik, Ojeda, MacNeish, Greene, and Eichele were all offered a substantial salary, bonus eligibility, and stock options.**

The Essentium Defendants admit that Jabil offered various compensation to Gjovik, Ojeda, MacNeish, Greene and Eichele. The Essentium Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in paragraph 30 and therefore deny them.

**31.    In return, and as a condition of employment, each acknowledged in writing that he had "accepted a position of trust which requires the maintenance of confidential and proprietary information." Complete, accurate, and authentic copies of the employment offers and acknowledgements are attached as Composite Exhibit A.**

The Essentium Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31, and accordingly deny those allegations.

**32.    Each also executed a Commitment of Confidentiality. Through the Commitments of Confidentiality, Gjovik, Ojeda, MacNeish, Greene, and Eichele agreed, among other things, that:**

**a.    They would develop or have access to "Trade Secrets" and "Proprietary Materials";**

**b.    They were assigning to Jabil all "Work Product," which**

includes all "inventions, improvements, ideas, computer programs, works of authorship, and the like (i) resulting from or within the scope of [their] employment or related to Jabil's business;  or (ii) conceived in whole or in part by using Jabil's time or resources";

   c. They were agreeing not to "exploit for personal gain any of the Confidential Materials or Work Product, nor participate or assist with any other person, or entity, directly or indirectly, in a manner that contradicts or frustrates this Agreement's purpose"; and

   d. They were agreeing not to "solicit any Jabil employee to (i) terminate his or her employment relationship with Jabil, or (ii) work for any other person or entity engaged in Jabil's business."

The Essentium Defendants are informed and believe, and on that basis admit, that each individual named in each "Commitment of Confidentiality" included as part of Composite Exhibit B to the amended complaint signed such a document. The original of those documents are the best evidence of their contents.  The Essentium Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 32, and accordingly deny them.

   **33.** **The Commitments of Confidentiality are effective until "two years after [each employee's] employment ends" for all issues other than trade secrets, and are effective as to trade secrets as long "as the information in question constitutes a trade secret under applicable law."   Complete, accurate, and authentic copies of the executed Commitments of Confidentiality are attached as Composite Exhibit B.**

The original of those documents are the best evidence of their contents.

The Essentium Defendants lack knowledge or information sufficient to form a

belief about the truth of the remaining allegations in paragraph 33, and accordingly deny them.

**34.    Ultimately, with the support of millions of dollars in Jabil expenditures and thousands of hours of engineering time from Jabil engineers both in the United States and abroad, Gjovik, Ojeda, MacNeish, Greene, Eichele, and the rest of their 3D-printing team successfully developed the new FFF printer. Because the resulting printer was capable of operating ten times faster than the next-fastest commercially available FFF printer, Jabil named its new printer "TenX."**

The Essentium Defendants deny the allegations contained in paragraph 34.

### III.    Gjovik, MacNeish, and others betrayed Jabil's trust and set the stage for Essentium to raid Jabil's TenX program.

The Essentium Defendants deny the allegations contained in this sentence.

**35.    While Gjovik, Ojeda, and MacNeish were helping develop TenX at Jabil, they were also privately planning to use TenX technology, designs, business plans, and associated vendor relationships to "spin off" their own company. At least as early as 2016, they began conspiring to either start a new company in which Jabil had only a minority equity interest, start an entirely independent company, or—as would ultimately happen—offer Jabil's highly confidential TenX trade secrets to a direct competitor in exchange for even more lucrative compensation and equity packages. By at least mid-2017, a contractor named Lars Uffhausen, who had been working on the TenX project under a nondisclosure agreement, joined the conspiracy. Together, Gjovik, Ojeda, MacNeish and Uffhausen developed extensive "pitch decks" for their contemplated spin-off company, and those decks referred to Jabil as the TenX's development partner rather than as the company that developed TenX and owned all associated intellectual property and trade secrets.**

The Essentium Defendants deny the allegations contained paragraph 35.

**36.    Gjovik, Ojeda, MacNeish, and Uffhausen took steps to actively**

123683765.2

**conceal their efforts. Among other transgressions, the three began holding private meetings to discuss their plans, using personal emails to communicate, storing highly confidential CAD and other files on private third-party document repositories and personal devices, and shipping components purchased with Jabil credit cards to their homes for use in their competing endeavors.**

The Essentium Defendants deny the allegations contained paragraph 36.

**37.   In addition to their flagrant theft of highly confidential information, Gjovik, MacNeish, Uffhausen, and others actively solicited at least two other important members of Jabil's 3D-printing team to terminate their employment with Jabil and join them in creating or working for a direct competitor.**

The Essentium Defendants deny the allegations contained paragraph 37.

**IV.   Essentium initially attempted to license Jabil's TenX technology.**

The Essentium Defendants admit that Essentium Materials and Jabil discussed forming one or more entities that could enter into one or more licensing agreements amongst Essentium Materials, Jabil and/or a newly formed entity or entities.   The Essentium Defendants deny the allegations contained in this sentence.

**38.   While Gjovik, Ojeda, MacNeish and Uffhausen were conspiring against Jabil, they were also purporting to represent Jabil in negotiations with Defendant Essentium Materials.**

The Essentium Defendants deny the allegations contained in paragraph 38.

**39.   As its name suggests, Essentium Materials was primarily a manufacturer of 3D-printing materials. It was, at bottom, a filament company without a commercially viable FFF printer.**

123683765.2

The Essentium Defendants admit that Defendant Essentium Materials manufactures 3D-printing materials.  The Essentium Defendants deny the remaining allegations in paragraph 39.

**40.    In an effort to "jumpstart" its own FFF printer program, Essentium Materials attempted to reach a licensing or partnership agreement through which Essentium would offer filament technology in exchange for Jabil's printing technology. Jabil and Essentium Materials engaged in protracted negotiations—including several in-person meetings, site visits, product inspections, and other communications subject to nondisclosure agreements—but the companies never came to terms on a deal.**

The Essentium Defendants admit that Essentium Materials visited Jabil's site in San Jose California at Jabil's invitation, inspected that site and one of Jabil's TenX prototypes on that visit, and thereafter openly communicated with Jabil in seeking to enter into a licensing arrangement for the use of the TenX prototypes to further develop it into a functioning printer that could work with Essentium Materials materials business, which efforts included at least one in-person meeting in early August 2017 where Jabil sent its team to Essentium Materials headquarters in Texas to flesh out the ideas for a relationship going forward.  Jabil's employees, with authority to do so, shared business plans, pitch decks, marketing ideas with Essentium Materials, which had no obligation to Jabil to treat that information as belonging to or even constituting confidential information owned by Jabil. The licensing discussions continued into September,

123683765.2

but Jabil ultimately abandoned its 3-D printer plans.  The Essentium Defendants

lack sufficient information to form a belief about the truth of the allegation in

paragraph 38 quoting the word "jumpstart" and accordingly deny it.   The

Essentium Defendants deny the remaining allegations in paragraph 40.

## V.   When legitimate negotiations failed, Essentium poached Jabil's TenX employees and misappropriated Jabil's TenX trade secrets.

The Essentium Defendants deny the allegations in this sentence.

**41.   By at least August 2017, Gjovik, Ojeda, MacNeish, and Uffhausen came to believe that they would not be able to create a Jabil-approved "spin off" company to monetize TenX. Believing this would foreclose their goal of "getting rich quick," Gjovik, Ojeda, MacNeish,  and Uffhausen conspired with Steven Birdwell, Gene Birdwell, Blake Teipel, and others to instead poach the TenX team's employees and misappropriate its technology and business plans for use in a contemplated Essentium "NewCo"—a company in which Gjovik, Ojeda, MacNeish, and Uffhausen would have lucrative equity interests.  The Birdwells were investors in Essentium Materials.  At the time, both also served on its board of directors, and Gene Birdwell was its CEO. Blake Teipel was the President and Chief Technology Officer of Essentium Materials.**

The Essentium Defendants deny the allegations in paragraph 41, except

that they admit that (a) between late August and the end of September 2017,

Gjovik, Ojeda, MacNeish and Uffhausen realized that Jabil was in the process of

changing its strategy, (b) in late September 2017, Jabil abandoned the idea of

licensing the TenX prototypes to anyone, (c) the Birdwells were investors in

Essentium Materials, (d) the Birdwells served on Essentium Materials board of

directors and Gene Birdwell was its CEO, and (d) Blake Teipel was the President

and Chief Technology Officer of Essentium Materials.

**42.     Specifically, in approximately August 2017, Ojeda reached out to Teipel, Steve Birdwell, and Gene Birdwell—confidentially and without Jabil's knowledge—to inquire whether Essentium Materials and its principals would invest in and assist with the creation of an Essentium NewCo to develop a TenX-based printer for their own personal profit.  Over the course of approximately the next month, Gjovik, MacNeish, Uffhausen, and Ojeda continually discussed the Essentium NewCo with Teipel and the Birdwells.  Because everyone understood that Jabil would likely oppose these discussions and the contemplated Essentium NewCo plan, Teipel and the Birdwells primarily communicated with Gjovik,  MacNeish, Uffhausen, and Ojeda through private, non-Jabil email accounts or through meetings in person, or by video conference.**

The Essentium Defendants deny the allegations in paragraph 42.

**43.     Teipel and the Birdwells viewed Jabil's TenX technology, its TenX team, its strategic partnerships, and its business plan as potentially highly profitable and critical to the success of Essentium Materials.  They were concerned, however, with the legal risk associated with using Jabil technology, information, and personnel to create the Essentium NewCo without Jabil's consent.  Gjovik, MacNeish, Uffhausen, and Ojeda shared their Jabil contracts with Teipel and the Birdwells, including their Commitments of Confidentiality and other nondisclosure agreements. Everyone understood that creating, pitching, and operating the  Essentium NewCo as contemplated would require the use of documents and information that Jabil considered to be Confidential Materials pursuant to the Commitments of Confidentiality.**

The Essentium Defendants deny the allegations in paragraph 43.

**44.     Nevertheless, Teipel and the Birdwells agreed to join the conspiracy—to invest in and help form the Essentium NewCo—so long as everyone took steps to "de-risk" the investment.  Accordingly, Gjovik,**

MacNeish, Uffhausen, Ojeda, Teipel, and the Birdwells formed a two-pronged "de-risking" plan.

The Essentium Defendants deny the allegations in paragraph 44.

45.     First, the conspirators planned for MacNeish and Uffhausen to leave Jabil while Gjovik and Ojeda temporarily stayed behind. Second, after MacNeish and Uffhausen left, Gjovik and Ojeda would attempt to use this departure to convince Jabil that the viability of the TenX program was in jeopardy and Jabil should license the TenX technology to Essentium Materials to salvage some of the project's value.  Meanwhile, MacNeish and Uffhausen would immediately join Essentium Materials and begin work on the Essentium NewCo.

The Essentium Defendants deny the allegations in paragraph 45.

46.     Gjovik, MacNeish, Uffhausen, Ojeda, Teipel, and the Birdwells all agreed to conceal the plan to form an Essentium NewCo and the corresponding de-risking efforts from Jabil, including by concealing Ojeda and Gjovik's plans to join Essentium. The Birdwells, in particular, viewed the time Gjovik and Ojeda spent working to advance the Essentium NewCo while still employed by Jabil as beneficial given it was time spent on Essentium's behalf at Jabil's expense.

The Essentium Defendants deny the allegations in paragraph 46.

47.     In approximately early September 2017, Teipel and the Birdwells conveyed to Gjovik, MacNeish, Uffhausen, and Ojeda that they had set aside money to be invested in the Essentium NewCo with provisions for lucrative salaries and equity interests that the group had previously negotiated.  Gjovik, MacNeish, Uffhausen, and Ojeda consequently began their efforts to effectuate the de-risking plan.

The Essentium Defendants deny the allegations in paragraph 47.

48.     As part of their efforts, MacNeish organized and led a meeting in San Dimas, California, on or about September 6, 2017. Attendees included MacNeish, Gjovik, Ojeda, Uffhausen, Greene, Eichele, and others.

The Essentium Defendants deny the allegations in paragraph 48.

**49.     At the meeting, MacNeish, Gjovik, and Uffhausen outlined their conspiracy with Essentium Materials, the Birdwells, and Teipel, including the forthcoming de-risking and licensing efforts.  They emphasized that regardless of whether Jabil agreed to the licensing arrangement, Gjovik, MacNeish, Ojeda, and Uffhausen would all join Essentium within months, and the group would take the TenX technology and business plans with them one way or another (i.e., lawfully or otherwise). MacNeish, Gjovik, and Uffhausen asked Greene and Eichele to join the conspiracy and work with them at Essentium, assuring Greene and Eichele that Essentium Materials and Teipel had agreed to employ them with comparable or better compensation. When the issue of the conspiracy's illegality was raised, MacNeish told the group that he had already spoken with Essentium Materials' leadership about the issue, that MacNeish and his coconspirators thought it was unlikely that Jabil would take legal action, and that Essentium and Teipel would use company and other resources to defend the group in the event of a lawsuit. Defendants Greene and Eichele agreed to join the conspiracy.**

The Essentium Defendants deny the allegations in paragraph 49.

**50.     On September 12, 2017, MacNeish executed his employment agreement with Essentium.**

The Essentium Defendants admit the allegations in paragraph 50.

**51.     The next day, and as the conspirators agreed, MacNeish announced his resignation to Jabil. He also logged into his Jabil-employee user profile on a Jabil computer and created a file called "jabil.zip" that contained a plethora of Jabil trade secrets and confidential business information, including thousands of TenX CAD files and other confidential design documents, bills of material ("BOMs") for Jabil's 3D-printing projects, photos and videos of the development of TenX and other 3D-printing projects, receipts for TenX materials and expenditures, spreadsheets of performance requirements and calculations, nondisclosure agreements with third parties, and PowerPoint "IP" presentations regarding design plans for the TenX program. In direct contravention of**

Jabil security policies, MacNeish transferred this file to an external USB drive and uploaded it to a non-Jabil DropBox account for use at Essentium. That same day, MacNeish also exported a list of "Jabil Contacts," which Jabil has not been able to recover despite computer-forensics efforts. Further, MacNeish had previously installed commercial data-wiping software called "CCleaner" onto the Jabil-owned computer. On information and belief, MacNeish used that software to destroy Jabil data and interfere with Jabil's ability to detect his efforts to advance the Defendants' conspiracy.

The Essentium Defendants deny or lack sufficient information to form a belief about the truth of the allegations in paragraph 51 and accordingly deny them.

52.    Uffhausen also resigned from Jabil on September 13, 2017. Consistent with the plan to conceal their conspiracy, Gjovik and Ojeda initially and falsely told Jabil leadership that they did not know which company the two would be joining.

The Essentium Defendants deny the allegations in paragraph 52.

53.    As planned, Ojeda then told Jabil leadership that he believed the TenX program could not continue without MacNeish, and he obtained authority to explore licensing opportunities with Essentium Materials.  Over the course of the next few weeks, Ojeda used his Jabil email address to ostensibly negotiate potential licensing opportunities with Essentium.  At or about the same time, he used a personal email address and personal conferences to discuss with Gjovik, MacNeish, Uffhausen, Teipel, and Steven Birdwell which licensing terms would be most favorable to Essentium Materials and the Essentium NewCo.  While ostensibly negotiating the licensing agreement, neither Ojeda nor any of his coconspirators disclosed that Ojeda and Gjovik were advancing their own prospective future interests  as founders of the Essentium NewCo.

The Essentium Defendants deny the allegations in paragraph 53.

25

**54.     At or about this time, the Defendants formed the Essentium NewCo, which they named Essentium Machines LLC.**

The Essentium Defendants deny the allegations contained in paragraph 64, but admit that Essentium Machines, LLC was formed on or about September 18, 2017.

**55.     Among other overt acts in furtherance of this conspiracy, Uffhausen used his "essentiummachines.com" email address to organize an October 6, 2017 conference with MacNeish, Gjovik, and Ojeda. The stated purpose of the conference was to discuss milestones, target dates, and expenditures associated with a "new product" for a new company that the group intended to create using "seed money" from an unspecified investor. The invitation included 3D-printer specifications and vendor information unique to Jabil's TenX platform. Uffhausen explained, "[W]e need an estimate of cumulative cash expenditures at major milestones so we can plan for how much of the seed money we will burn before we want to do the Series A." At the time of the invitation, Gjovik and Ojeda still worked for Jabil.**

The Essentium Defendants deny the allegations contained in paragraph 55.

**56.     During the licensing negotiations—and while Ojeda and Gjovik were still employed by Jabil—Gjovik, MacNeish, Ojeda, Uffhausen, Teipel, Steven Birdwell, and others prepared investment materials for Essentium Machines.  These investment materials incorporated confidential Jabil business, technical, and marketing materials.  Among other things, they created a "teaser" document for Essentium Machines that included photographs and CAD depictions of Jabil's pre-market TenX printer, as well as financial projections that were plagiarized from Jabil business plans and business information.  Gjovik, MacNeish, Ojeda, Uffhausen, Teipel, and Steven Birdwell also created an Essentium Machines white paper that was based on a highly confidential Jabil TenX product and business plan. Several passages of the white paper were lifted substantially verbatim from the Jabil TenX product and business plan.  Steven Birdwell distributed versions of the teaser and white paper to prospective investors with this information while Gjovik and Ojeda were still employed by Jabil.  Some**

versions of the teaser alluded to Gjovik and Ojeda as founders of Essentium Machines, and others expressly identified them. Gjovik, MacNeish, Ojeda, Uffhausen, Teipel, and the Birdwells concealed the development and distribution of these materials from Jabil.

The Essentium Defendants deny the allegations contained in paragraph 55.

57. By October 11, Jabil learned that Essentium had hired MacNeish. In response, Jabil sent two letters. The first went to Essentium Materials with the subject line: "Confidentiality Obligations, Intellectual Property Rights and Non-Solicitation." The letter began as follows:

> Given the directly competitive nature of Essentium's business to Jabil's business, and Mr. MacNeish's significant exposure to Jabil's confidential and proprietary information, including but not limited to Jabil's plans, technical roadmaps, specifications, product and material functionalities and know-how that also relate to 3D printers and 3D printer filament, it is important that we make you aware of Mr. MacNeish's ongoing obligations in these regards.

Jabil then advised of the existence and terms of (a) MacNeish's ongoing Commitment of Confidentiality—including his assignment of Work Product to Jabil; (b) his agreement to refrain from disclosing trade secrets; and (c) his agreement to refrain from soliciting Jabil employees to leave the company. Finally, Jabil reiterated in the letter that "Jabil is and will continue to be in the 3D printing business, [and so] Mr. MacNeish's undertakings are applicable to his current employment with Essentium." Jabil closed by adding that it had come to its "attention that Essentium has and/or may currently be in the process of recruiting other former and current Jabil employees" and that "those individuals have comparable confidentiality, assignment, and non-solicitation obligations." A complete, accurate, and authentic copy of the letter and its shipment receipt are attached as Composite Exhibit C.

The Essentium Defendants admit the allegations contained in the first

sentence of paragraph 57, admit that Essentium Materials received a letter, a copy

of which is attached as part of Composite Exhibit C to the second amended complaint, and admit that the original of that letter is the best evidence of its content. The Essentium Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations concerning remaining portion of Composite Exhibit C. The Essentium Defendants deny the remaining allegations contained in paragraph 57.

**58.    That same day, Jabil sent the second letter, which was substantively identical to the first, to MacNeish himself. Jabil further demanded that MacNeish "immediately return" any "documents, records, information (including electronic copies or communications) or other property of Jabil." A complete, accurate, and authentic copy of the letter to MacNeish and its shipment receipt are attached as Composite Exhibit D.**

The Essentium Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations that Jabil sent such a letter and accordingly deny the same.  The Essentium Defendants deny the remaining allegations contained in paragraph 58.

**59.    The Birdwells, Teipel, Gjovik, MacNeish, Uffhausen, and Ojeda discussed these letters by telephone conference and agreed to proceed with Essentium Machines as planned with no corrective action.**

The Essentium Defendants deny or lack information sufficient to form a belief about the truth of these allegations and accordingly deny the same.

**60.    Prior to October 13, 2017, Jabil declined to license its TenX technology to the Defendants.**

The Essentium Defendants deny the allegations contained in paragraph 60.

**61.    On October 13, 2017, Gjovik, Ojeda, Eichele, and Greene left Jabil. Each executed a Separation Agreement that afforded them a substantial monetary payment. In exchange, Gjovik, Ojeda, Eichele, and Greene agreed, among other things, that:**

> **a.    They would comply with the terms of "any Employee NDA and/or Commitment of Confidentiality and/or any customer-specific NDA"; and**

> **b.    They would, "not later than the Separation Date, . . . give to Jabil all property in [their] possession, custody or control which was obtained from Jabil or from any of its customers/potential customers, vendors/potential vendors, merger/acquisition candidates, employees, contractors or consultants, including but not limited to the originals and all copies of any documents, files, data or information (electronic or hard-copy), access cards, credit cards, passwords and file-access methods/protocols, computers/laptops/PDAs (including all software and peripherals), cell phones, credit cards and stored documents/files/information (with all documents, files and information having been returned unaltered and unencrypted)";**

> **c.    "Any litigation between the parties must be brought in a court having jurisdiction in Pinellas County, Florida, the location of Jabil's headquarters . . . ."**

**Complete, accurate, and authentic copies of the Separation Agreements are attached as Composite Exhibit E.**

The Essentium Defendants admit that after being notified by Jabil that Jabil planned to terminate the employment of Gjovik, Ojeda, Eichele and Greene, each signed various documents titled "Employment Separation Agreement, Waiver and Release of Claims," copies of which are attached as part of Composite

Exhibit E to the amended complaint, and admit that the original of those documents are the best evidence of their respective content. The Essentium Defendants deny the remaining allegations contained in paragraph 61.

**62.    At the time Gjovik, Ojeda, Eichele, and Greene executed their Separation Agreements, they knew that they would not comply with their obligations to Jabil.**

The Essentium Defendants deny the allegations contained in paragraph 62.

**63.    Computer forensics confirm that, like his coconspirator MacNeish, Gjovik transferred or copied thousands of Jabil files to a non-Jabil DropBox account and at least one USB device during the months preceding his departure. Indeed, on his last day at Jabil, Gjovik attached a USB device to his Jabil-issued computer. And approximately one week before he departed from Jabil, Gjovik downloaded and executed data-destruction software called "Eraser" on his Jabil-issued computer, permanently destroying Jabil data in direct contravention of Jabil security policies, his Commitment of Confidentiality, and other applicable law.**

The Essentium Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations concerning Jabil's alleged "Computer-forensics" and accordingly deny them.  The Essentium Defendants deny the remaining allegations contained in paragraph 63.

**64.    Computer forensics also confirm that on the morning of October 18, after Defendant Greene's employment with Jabil had ended but before he had returned his Jabil- issued laptop, Greene copied and transferred a backup of his Jabil Outlook account—including Jabil emails, contacts, calendar entries, and other information—to an external USB storage device in direct contravention of Jabil security policies, his Commitment of  Confidentiality, and other applicable law. That same morning, Greene also transferred, at a minimum, hundreds of confidential**

TenX design documents to the USB device.

The Essentium Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations concerning Jabil's alleged "Computer-forensics" and accordingly deny them. The Essentium Defendants deny the remaining allegations contained in paragraph 64.

**65.     By Monday, October 16, Gjovik and Ojeda had begun working for Essentium Machines. They received the substantial salaries and equity interests as promised by the Birdwells.**

The Essentium Defendants admit Gjovik and Ojeda began working for Essentium Machines on October 16, 2020.  The Essentium Defendants lack sufficient knowledge or information to form a belief about the truth of the remaining allegations contained in paragraph 65, and accordingly deny the same.

**66.     Essentium did not have a 3D printer of its own before MacNeish left Jabil and began working at Essentium Machines.  By the time Gjovik and Ojeda arrived, MacNeish had either already completed or was nearly finished creating a 3D-printing technology demonstrator.  The Defendants planned on using the technology demonstrator during investor pitch meetings and later converting it into the High Speed Extrusion, or "HSE," platform.  MacNeish and others had used Jabil's TenX designs and confidential supply-chain partners to accelerate the development of this technology demonstrator.**

The Essentium Defendants admit that Essentium, Inc. (which did not exist in October 2017) did not have a 3D printer of its own at any time in before Jabil let its hardware team go in October 2017.  The Essentium Defendants deny the

123683765.2

remaining allegations contained in paragraph 66.

**67.     At Essentium Machines, Uffhausen, Ojeda, MacNeish, Gjovik, and Teipel also immediately began contributing to investment pitches to prospective investors introduced to the group by the Birdwells.  The central theme and message of these presentations was that the Defendants were "not guessing" about Essentium Machines' business plan because they had "used Jabil as a petri dish."  They claimed to know, as a result of their time at Jabil, exactly the right-supply chain partners, target markets, and printer designs to use to produce best-in-class 3D printers at scale.  Their intention was for potential investors to conclude that the Defendants would use their investment "to finish what [they] had started at Jabil."**

The Essentium Defendants admit that Uffhausen, Ojeda, MacNeish, Gjovik and Teipel (while working for Essentium Materials, LLC or Essentium Machines, LLC) contributed information or ideas for use in slide decks for potential use by Essentium Materials or Essentium Machines with prospective investors.   The Essentium Defendants deny or lack sufficient knowledge or information to form a belief about the allegations that purport to quote text from some other source that has not been disclosed by the Second Amended Complaint.  The Essentium Defendants deny the remaining allegations contained in paragraph 67.

**68.     In addition to using stolen Jabil business information in investment pitches, the Defendants continued to use detailed, multi-year TenX business plans that included: technical aspects of the TenX printer and other confidential information relating to: the expected performance of the TenX printer; pro forma sales data, pricing, costs, margins, materials, accessories, and consumables; staffing plans; anticipated capital and operational expenditures; research-and-development plans and budgets;**

and timelines for the use of resources and related development benchmarks.

The Essentium Defendants deny the allegations contained in paragraph 67

**69.    The Defendants also stole and converted Jabil's confidential Lean Product Plan into an Essentium product plan.   The result was Essentium's Product Plan, which is a 46-page, approximately 7,300-word business plan that is essentially identical to Jabil's Lean Product Plan but with references to Jabil deleted and the work "EM" (or Essentium Machines) substituted for the word "TenX." Teipel and other Essentium principals who used the document knew its origin, versions of which were circulated still including commentary from a Jabil employee who never joined Essentium.**

The Essentium Defendants deny the allegations contained in paragraph 68

**70.    In January 2018, Gjovik, Ojeda, MacNeish, Uffhausen, and executives from Essentium Materials incorporated Essentium, Inc., which acquired Essentium Materials and Essentium Machines.**

The Essentium Defendants admit that Essentium, Inc. was formed in

January 2018, but deny the remaining allegations contained in paragraph 70.

**71.    The following April—far sooner than would have been possible through its own legitimate efforts—Essentium also unveiled the conspirators' purportedly "new product": the "High Speed Extrusion," or "HSE," FFF printing platform.**

The Essentium Defendants deny the allegations contained in paragraph

71.

**72.    In furtherance of their conspiracy, the Defendants used stolen Jabil assets to help develop the HSE platform. In particular, someone acting on behalf of the Defendants—on information and belief, Defendant MacNeish himself—stole a Jabil laptop that had been issued to Defendant MacNeish and, for more than a year, repeatedly accessed MacNeish's Jabil**

**user profile containing highly confidential TenX CAD files and design documents. Security software installed on the laptop confirmed that MacNeish also kept thousands of stolen TenX CAD files and documents in his DropBox account through at least mid-2018. The Defendants used those files to develop the HSE platform. In 2019, Defendant MacNeish intentionally destroyed the laptop by discarding it in a "dumpster" outside of an Essentium facility located in California.**

The Essentium Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations concerning Jabil's alleged installation of "[s]ecurity software" on "the laptop" and accordingly deny them. The Essentium Defendants admit that in 2019, MacNeish discarded a laptop that he found in an Essentium facility. The Essentium Defendants deny or lack sufficient knowledge or information to form a belief about the truth of the remaining allegations contained in paragraph 72 and therefore deny those allegations.

**73.     Portions of Defendants' computer-related misconduct are set forth more fully in the declarations of Mark Lanterman attached as Composite Exhibit F, which Jabil incorporates into this Second Amended Complaint.**

The Essentium Defendants admit that copies of documents entitled Declaration of Mark Lanterman and Second Declaration of Mark Lanterman are attached as a part of Composite Exhibit F to the amended complaint. The Essentium Defendants deny or lack sufficient knowledge or information to form a belief about the truth of the remaining allegations contained in paragraph 73.

123683765.2

**74.    Portions of the Defendants' conspiracy, misappropriation, and continued use of Jabil trade secrets and confidential information are set forth more fully in the declaration of Gregory Ojeda attached as Exhibit G, which Jabil incorporates into this Second Amended Complaint.**

The Essentium Defendants deny the allegations contained in paragraph 74.

**75.    In all material respects, Essentium's HSE printer is a "knock-off" of an earlier version of Jabil's TenX with only relatively minor alterations. Indeed, a side-by-side comparison of the two is striking. The HSE is not only modeled after the TenX design and made by many of the TenX engineers, it is also constructed using hardware and software components that, in some cases, were custom-made for the TenX platform by vendors who Jabil identified, vetted, and selected at substantial expense and who Jabil worked closely with throughout TenX's development to ensure that the components functioned efficiently and effectively.**

The Essentium Defendants deny the allegations of paragraph 75.

**76.    Simply put, Essentium has stolen Jabil's trade secrets and capitalized on confidential information that Jabil invested thousands of hours over a period of years and millions of dollars to develop.**

The Essentium Defendants deny the allegations of paragraph 76.

**77.    Gjovik, Ojeda, MacNeish, and Uffhausen all hold themselves out as "founders" of Essentium and have occupied or currently occupy executive leadership positions. Gjovik is currently Essentium's "Chief Product Officer." MacNeish is Essentium's "Head of R&D for Machines." And Uffhausen is not only Essentium's Chief Operating Officer, but also its Chief Financial Officer. "Under his direction," Uffhausen claims, "Essentium has raised one of the highest Series A funding in the history of additive manufacturing"—funding that would not have been possible but for his role in Defendants' conspiracy to unjustly enrich themselves at Jabil's expense.**

The Essentium Defendants admit that

➢ the   Essentium3d.com/team   website   identifies   Gjovik,

MacNeish, and Uffhausen as co-founders of Essentium, Inc.;

➢ Ojeda at one time occupied an executive leadership position with Essentium, Inc.;

➢ Gjovik, MacNeish, and Uffhausen currently occupy such executive leadership positions;

➢ MacNeish holds the title of "Head of R&D for Machines,"

➢ Uffhausen holds the titles of "Chief Operating Officer" and "Chief Financial Officer" and is a person under whose direction Essentium, Inc. has raised what Essentium Inc. believes to be one of the highest Series A funding in the history of the additive manufacturing;

➢ Gjovik, MacNeish, Uffhausen and Ojeda from time to time have identified themselves to others as founders or co-founders of "Essentium."

The Essentium Defendants deny or lack information sufficient to form a belief about the remaining allegations of paragraph 77.

## VI.   Defendants' misconduct is ongoing, willful, and audacious.

The Essentium Defendants deny the allegations in this sentence.

**78.    Defendants' misconduct has been willful and remains ongoing—audaciously so. On its website, Essentium brazenly and repeatedly alluded**

to its theft of Jabil's TenX, boasting:

> **a.    "At up to 10x faster than the competition, the Essentium HSE 180•S 3D Printing Platform is built to transform manufacturing floors and solve the issues of speed, strength, and cost" (emphasis in original);**

> **b.    "THE HSE 180•S 3D PRINTER IS UP TO 10X FASTER THAN THE COMPETITION" (emphasis added); and**

> **c.    "The HSE 180•S 3D Printer prints your parts up to 10x faster than conventional FFF printers" (emphasis added).**

The Essentium Defendants admit that they operate a website and that such website is the best evidence of the content of that website. The Essentium Defendants deny the remaining allegations in paragraph 78.

**79.    Defendants also openly tout that the HSE uses an "advanced direct-drive servo controlled extruder system," "advanced motion control," and a purportedly "proprietary nozzle"—all of which were designed in Jabil's TenX program and painstakingly calibrated and troubleshot by Jabil engineers through numerous experiments and trials. The functionality gained and lessons learned from Jabil's efforts were hard-earned and are essential to the TenX's (and correspondingly the HSE's) ability to operate as a cohesive whole, informing the selection, materials, size, position, and orientation of elements common to both Jabil's TenX and Essentium's HSE platforms. These amount to independently valuable and protected trade secrets that Essentium has misappropriated.**

The Essentium Defendants deny the allegations in paragraph 79.

**80.    While Jabil has improved the TenX since Defendants absconded with Jabil's trade secrets and other confidential information such that the current version of the TenX platform is technically superior to the HSE platform, Essentium nevertheless marketed its stolen HSE platform to the general public before Jabil unveiled TenX. Doing so with an inferior product**

not only unjustly enriched Defendants, but also interfered with Jabil's ability to monetize the TenX program and risked damaging Jabil's reputation by marketing essentially an outdated iteration of Jabil's TenX.

The Essentium Defendants deny the allegations in paragraph 80.

**81.    Jabil brings this action against Defendants to prevent further misuse of its technology and to obtain compensation for Defendants' willful, wrongful, and ongoing conduct and their consequent unjust enrichment.**

The Essentium Defendants deny the allegations in paragraph 81.

**82.    All conditions precedent to bringing this action have occurred, been satisfied, or have been waived.**

The Essentium Defendants deny the allegations in paragraph 82. In particular, in order for any item at issue in Jabil's amended complaint to constitute a "trade secret" or "confidential information belonging to it, such information cannot be generally available to the public, and Jabil must have taken steps to keep that information secret from becoming known outside of Jabil. Some portion or all of that information that Jabil characterizes as "trade secret" or "confidential" constitutes public information and fails to qualify as a trade secret or confidential information. The Essentium Defendants also lack sufficient knowledge or information to currently specify with particularity whether there are other conditions precedent that Jabil has failed to perform or that have failed to occur.

**COUNT I – Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act (Against All Defendants)**

**83.    Jabil incorporates the allegations set forth in paragraphs 1 through 82, above.**

The Essentium Defendants incorporate as their answer to paragraph 83 each and every answer they provided to paragraphs 1 through 82 above.

**84.    This is an action for damages and injunctive relief under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836.**

The Essentium Defendants admit that Jabil has self-characterized a claim in this Count as described in its allegations. The Essentium Defendants deny the remaining allegations contained in paragraph 84.

**85.    Defendants misappropriated numerous Jabil trade secrets related to its TenX technology, its customers, its vendors, its business and methodologies, and its systems and tools used for the goods and services it provides to customers.**

The Essentium Defendants deny the allegations contained in paragraph 85.

**86.    The trade secrets misappropriated by Defendants derive independent economic value by virtue of not being generally known to, and not being readily ascertainable by, other persons who can obtain economic value from their disclosure or use.**

The Essentium Defendants deny the allegations contained in paragraph 86.

**87.    Jabil takes reasonable measures to maintain the secrecy of and protect its trade secrets, including by requiring execution of Commitments of Confidentiality, by limiting access to trade secrets and other highly confidential information, and by taking steps to prevent anyone from accessing such information who is not subject to nondisclosure obligations.**

The Essentium Defendants deny the allegations contained in paragraph 87

both generally and as more particularly stated in the answer to paragraph 82.

**88.    Defendants Gjovik, MacNeish, Greene, Eichele, Uffhausen, and others, through their employment and engagement with Jabil, had access to, acquired, and had direct knowledge of Jabil's TenX trade secrets and other highly confidential information as described, in part, above.**

The Essentium Defendants admit that the described individuals, while

employed by or consulting with Jabil, had access to certain information, but deny

the remaining allegations contained in paragraph 88.

**89.    Defendants Gjovik, MacNeish, Greene, Eichele, Uffhausen, and others were obligated, by contract and by applicable law, to refrain from disclosing, using, or benefitting from Jabil's trade secrets.**

The Essentium Defendants deny the allegations contained in paragraph 89.

**90.    Defendants Essentium, Essentium Materials, Steven Birdwell, Gene Birdwell, and Teipel knew that Defendants Gjovik, MacNeish, Greene, Eichele, Uffhausen, and others were subject to duties to maintain the secrecy and the limited use of the trade secrets.**

The Essentium Defendants deny or lack sufficient knowledge or

information to form a belief about the truth of the allegations contained in

paragraph 90.

**91.    Nonetheless, Defendants misappropriated and used Jabil's TenX trade secrets for their own benefit by acquiring them through improper means for use in unjustly enriching themselves and competing with Jabil.**

The Essentium Defendants deny the allegations contained in paragraph 91.

123683765.2

92.     As   a   direct   and   proximate   result   of   Defendants'
misappropriation, disclosure, and use of Jabil's TenX trade secrets in
violation of the DTSA, Jabil has suffered and will continue to suffer
immediate and irreparable injury to its business, goodwill, and income.

The Essentium Defendants deny the allegations contained in paragraph 92.

93.     In addition to causing Jabil to suffer monetary damages,
Defendants have caused Jabil to suffer damages for which it has no adequate
remedy at law to protect it from the unlawful and continuing
misappropriation and misuse of its trade secrets by Defendants.

The Essentium Defendants deny the allegations contained in paragraph 93.

94.     Jabil has a substantial likelihood of success on the merits of this
claim   because   of   Defendants'   willful,   wrongful,   and   ongoing
misappropriation, disclosure, and use of Jabil's trade secrets.

The Essentium Defendants deny the allegations contained in paragraph 94.

95.     The threat of harm to Jabil in the absence of injunctive relief far
outweighs the threat of harm to Defendants if an injunction is granted. Jabil
faces substantial financial losses, loss of goodwill, and loss of its competitive
position in the marketplace, while the only "hardship" imposed on
Defendants would be to prevent them from reaping any illicit gain or other
benefit from their willful, wrongful, and ongoing misappropriation,
disclosure, and use of Jabil's TenX trade secrets.

The Essentium Defendants deny the allegations contained in paragraph 95.

96.     The public interest would be served by granting the relief sought
in that the public unequivocally favors preventing entities and individuals
such as Defendants from profiting from their willful, wrongful, and ongoing
conduct.

The Essentium Defendants deny the allegations contained in paragraph 96.

97.     Jabil's TenX trade secrets concern products and services used

in interstate commerce, as Jabil provides goods and services to clients across the United States and abroad.

The Essentium Defendants deny the allegations contained in paragraph 97.

### COUNT II – Misappropriation of Trade Secrets in Violation of the Florida Uniform Trade Secrets Act
### (Against All Defendants)

**98.   Jabil incorporates the allegations set forth in paragraphs 1 through 82, above.**

The Essentium Defendants incorporate as their answer to paragraph 98 each and every answer they provided to paragraphs 1 through 82 above.

**99.   This is an action for damages and injunctive relief under the Florida Uniform Trade Secrets Act ("FUTSA"), Section 688.01, Florida Statutes.**

The Essentium Defendants admit that Jabil has self-characterized a claim in this Count as described in its allegations. The Essentium Defendants deny the remaining allegations contained in paragraph 99.

**100.   Defendants misappropriated numerous Jabil trade secrets related to its TenX technology, its customers, its vendors, its business and methodologies, and its systems and tools used for the goods and services it provides to customers.**

The Essentium Defendants deny the allegations contained in paragraph 100.

**101.   The trade secrets misappropriated by Defendants derive**

**independent economic value by virtue of not being generally known to, and not being readily ascertainable by, other persons who can obtain economic value from their disclosure or use.**

The Essentium Defendants deny the allegations contained in paragraph 101.

**102.   Jabil takes reasonable measures to maintain the secrecy of and protect its trade secrets, including by requiring execution of Commitments of Confidentiality, by limiting access to trade secrets and other highly confidential information, and by taking steps to prevent anyone from accessing such information who is not subject to nondisclosure obligations.**

The Essentium Defendants deny the allegations contained in paragraph 102.

**103.   Defendants Gjovik, MacNeish, Greene, Eichele, Uffhausen, and others through their employment and engagement with Jabil, had access to, acquired, and had direct knowledge of Jabil's TenX trade secrets and other highly confidential information as described, in part, above.**

The Essentium Defendants admit that these individuals had varying degrees of access to information while working for or consulting with Jabil.  The Essentium Defendants deny the remaining allegations contained in paragraph 103.

**104.   Defendants Gjovik, MacNeish, Greene, Eichele, Uffhausen, and others were obligated, by contract and by applicable law, to refrain from disclosing, using, or benefiting from Jabil's trade secrets.**

The Essentium Defendants deny the allegations contained in paragraph 104.

**105.   Defendants Essentium, Essentium Materials, Steven Birdwell, Gene Birdwell, and Teipel knew that Defendants Gjovik, MacNeish, Greene, Eichele, and Uffhausen, and others were subject to the duty to maintain the secrecy and the limited use of the trade secrets.**

The Essentium Defendants deny the allegations contained in paragraph

105.

**106.   Nonetheless, Defendants misappropriated and used Jabil's TenX trade secrets for their own benefit by acquiring them through improper means for use in unjustly enriching themselves and competing with Jabil.**

The Essentium Defendants deny the allegations contained in paragraph

106.

**107.   As a direct and proximate result of Defendants' misappropriation, disclosure, and use of Jabil's trade secrets in violation of the FUTSA, Jabil has suffered and will continue to suffer immediate and irreparable injury to its business, goodwill, and income.**

The Essentium Defendants deny the allegations contained in paragraph

107.

**108.   In addition to causing Jabil to suffer monetary damages, Defendants have caused Jabil to suffer damages for which it has no adequate remedy at law to protect it from the unlawful and continuing misappropriation, disclosure, or use of its trade secrets by Defendants.**

The Essentium Defendants deny the allegations contained in paragraph

108.

**109.   Jabil has a substantial likelihood of success on the merits of this claim because of Defendants' willful, wrongful, and ongoing**

123683765.2

**misappropriation and misuse of Jabil's trade secrets.**

The Essentium Defendants deny the allegations contained in paragraph 109.

**110.   The threat of harm to Jabil in the absence of injunctive relief far outweighs the threat of harm to Defendants if an injunction is granted. Jabil faces substantial financial losses, loss of goodwill, and loss of its competitive position in the marketplace, while the only "hardship" imposed on Defendants would be to prevent them from reaping any illicit gain or benefit from their willful, wrongful, and ongoing misappropriation, disclosure, and use of Jabil's trade secrets.**

The Essentium Defendants deny the allegations contained in paragraph 110.

**111.   The public interest would be served by granting the relief sought in that the public unequivocally favors preventing entities and individuals such as Defendants from profiting from their improper and unlawful conduct.**

The Essentium Defendants deny the allegations contained in paragraph 111.

**112.   The misappropriation by Defendants was willful and malicious. Accordingly, Jabil is entitled to an award of exemplary damages and attorneys' fees pursuant to Section 688.005, Florida Statutes.**

The Essentium Defendants deny the allegations contained in paragraph 112.

## COUNT III – Breach of Contract
### (Against Defendants Gjovik, MacNeish, Greene, and Eichele)

This Count is not directed against the Essentium Defendants and as such, no answer is required. Alternatively, the Essentium Defendants generally deny the allegations contained in paragraphs 113 through 117, inclusive.

## COUNT IV – Fraud in the Inducement
### (Against Defendants Gjovik, Greene, and Eichele)

This Count is not directed against the Essentium Defendants and as such, no answer is required. Alternatively, the Essentium Defendants generally deny the allegations contained in paragraphs 118 through 124, inclusive.

## COUNT V – Breach of Fiduciary Duty
### (Against Defendants Gjovik, MacNeish, Greene, and Eichele)

This Count is not directed against the Essentium Defendants and as such, no answer is required. Alternatively, the Essentium Defendants generally deny the allegations contained in paragraphs 125 through 131, inclusive.

## COUNT VI – Breach of Duty of Loyalty
### (Against Defendants Gjovik, MacNeish, Greene, and Eichele)

This Count is not directed against the Essentium Defendants and as such, no answer is required. Alternatively, the Essentium Defendants generally deny the allegations contained in paragraphs 132 through 136, inclusive.

**COUNT VII – Aiding and Abetting Breach of Fiduciary Duty
(Against Defendants Essentium, Essentium Materials, Steven Birdwell,
Gene Birdwell, Teipel, and Uffhausen)**

**137.   Jabil incorporates the allegations set forth in paragraphs 1
through 82, above.**

The Essentium Defendants incorporate as their answer to paragraph 137

each and every answer they provided to paragraphs 1 through 82 above.

**138.   This is a claim for aiding and abetting breaches of fiduciary
duties.**

The Essentium Defendants admit that Jabil self-describes this claim as

alleged, but deny the remaining allegations contained in paragraph 138.

**139.   Defendants Gjovik, MacNeish, Greene, and Eichele owed Jabil
fiduciary duties of loyalty, honesty, and care, as did Ojeda.**

The Essentium Defendants deny the allegations contained in paragraph

139.

**140.   These Defendants and Ojeda breached their fiduciary duties to
Jabil as described, in part, in Count V, including paragraph 130.**

The Essentium Defendants deny the allegations contained in paragraph

140.

**141.   Defendants Essentium, Essentium Materials, Steven Birdwell,
Gene Birdwell, Teipel, and Uffhausen well knew that Ojeda and Defendants
Gjovik, MacNeish, Greene, and Eichele were breaching their fiduciary
duties to Jabil.**

The Essentium Defendants deny the allegations contained in paragraph

141.

**142.   Moreover, Defendants Essentium, Essentium Materials, Steven Birdwell, Gene Birdwell, Teipel, and Uffhausen substantially assisted Gjovik, Ojeda, MacNeish, Greene, and Eichele with breaching their fiduciary duties to Jabil, including by facilitating meetings and other communications at which the breaches occurred, by offering financial and operational support in effectuating the breaches, and by affording Gjovik, Ojeda, MacNeish, Greene, Eichele, Uffhausen, and others employment and financial compensation in exchange for their breaches.**

The Essentium Defendants deny the allegations contained in paragraph

142.

**143.   Defendants   Essentium's,   Essentium   Materials',   Steven Birdwell's, Gene Birdwell's, Teipel's, and Uffhausen's aiding and abetting of Gjovik's, Ojeda's, MacNeish's, Greene's, and Eichele's breaches of their fiduciary duties directly and proximately caused injury and damages to Jabil. Their conduct was willful, was malicious, and warrants the imposition of punitive damages as well as all other appropriate relief.**

The Essentium Defendants deny the allegations contained in paragraph

143.

### COUNT VIII – Aiding and Abetting Breach of Duty of Loyalty
**(Against Defendants Essentium, Essentium Materials, Steven Birdwell, Gene Birdwell, Teipel, and Uffhausen)**

**144.   Jabil incorporates the allegations set forth in paragraphs 1 through 82, above.**

The Essentium Defendants incorporate as their answer to paragraph 144

each and every answer they provided to paragraphs 1 through 82 above.

**145.   This is a claim for aiding and abetting breaches of duties of**

**loyalty.**

The Essentium Defendants admit that Jabil self-describes this claim as stated here, but deny the remaining allegations contained in paragraph 145.

**146.   Defendants Gjovik, MacNeish, Greene, and Eichele and owed Jabil a common law duty of loyalty, as did Ojeda.**

The Essentium Defendants deny the allegations contained in paragraph 146.

**147.   These Defendants and Ojeda breached their duty of loyalty to Jabil as described, in part, in Count VI, including paragraph 135.**

The Essentium Defendants deny the allegations contained in paragraph 147.

**148.   Defendants Essentium, Essentium Materials, Steven Birdwell, Gene Birdwell, Teipel, and Uffhausen well knew that Ojeda and Defendants Gjovik, MacNeish, Greene, and Eichele were breaching their duty of loyalty to Jabil.**

The Essentium Defendants deny the allegations contained in paragraph 148.

**149.   Moreover, Defendants Essentium, Essentium Materials, Steven Birdwell, Gene Birdwell, Teipel, and Uffhausen substantially assisted Gjovik, Ojeda, MacNeish, Greene, and Eichele with breaching their duty of loyalty to Jabil, including by facilitating meetings and other communications at which the breaches occurred, by offering financial and operational support in effectuating the breaches, and by affording Gjovik, Ojeda, MacNeish, Greene, Eichele, Uffhausen, and others employment and financial compensation in exchange for their breaches.**

The Essentium Defendants deny the allegations contained in paragraph 149.

**150. Defendants Essentium's, Essentium Materials', Steven Birdwell's, Gene Birdwell's, Teipel's, and Uffhausen's aiding and abetting of Gjovik's, Ojeda's, MacNeish's, Greene's, and Eichele's breaches of their duty of loyalty directly and proximately caused injury and damages to Jabil. Their conduct was willful, was malicious, and warrants the imposition of punitive damages as well as all other appropriate relief.**

The Essentium Defendants deny the allegations contained in paragraph 150.

## COUNT IX – Tortious Interference
### (Against Defendants Essentium, Essentium Materials, Steven Birdwell, Gene Birdwell, Teipel, and Uffhausen)

**151. Jabil incorporates the allegations set forth in paragraphs 1 through 82, above.**

The Essentium Defendants incorporate as their answer to paragraph 151 each and every answer they provided to paragraphs 1 through 82 above.

**152. Defendants Essentium, Essentium Materials, Steven Birdwell, Gene Birdwell, Teipel, and Uffhausen were well aware of Gjovik's, Ojeda's, MacNeish's, Greene's, and Eichele's contractual obligations to Jabil.**

The Essentium Defendants deny the allegations contained in paragraph 152.

**153. Essentium, Essentium Materials, Steven Birdwell, Gene Birdwell, Teipel, and Uffhausen have induced or otherwise caused Gjovik, Ojeda, MacNeish, Greene, and Eichele to violate the terms of their Commitments of Confidentiality and other contractual obligations, or**

123683765.2

**assisted them with doing so.**

The Essentium Defendants deny the allegations contained in paragraph 153.

**154. The actions of Essentium, Essentium Materials, Steven Birdwell, Gene Birdwell, Teipel, and Uffhausen were calculated to impair, impede, and damage Jabil's legitimate business interests by unlawful means. The conduct of these Defendants was and is without justification and constitutes an unlawful, tortious, wrongful, unfair, and intentionally malicious interference with Jabil's contractual rights**

The Essentium Defendants deny the allegations contained in paragraph 154.

**155. The conduct of Essentium, Essentium Materials, Steven Birdwell, Gene Birdwell, Teipel, and Uffhausen constitutes a tortious interference with Jabil's contractual rights and, as a direct and proximate result, Jabil has incurred substantial damages. Their conduct was willful, was malicious, and warrants the imposition of punitive damages as well as all other appropriate relief.**

The Essentium Defendants deny the allegations contained in paragraph 155.

### COUNT X – Computer Fraud and Abuse Act
### (Against Defendants MacNeish, Gjovik, Greene, and Essentium)

This Count is not directed against Teipel or Uffhausen and as such no answer by them is required.  Alternatively, Teipel and Uffhausen generally deny the allegations contained in paragraphs 138 through 170, inclusive.

**156. Jabil incorporates the allegations set forth in paragraphs 1**

through 82, above.

The Essentium Companies incorporate as their answer to paragraph 156 each and every answer they provided to paragraphs 1 through 82 above.

**157.   This is a claim for compensatory damages under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.**

The Essentium Companies admit that Jabil has self-described this claim as set forth in paragraph 157, but deny the remaining allegations contained in paragraph 157.

**158.   Defendant MacNeish knew or should have known that Jabil maintained policies, including an Information Resource and Acceptable Use Policy, that prohibited employees from moving Jabil files to a device (e.g., USB, hard drive, etc.) not registered with Jabil's Information Technology personnel.**

The Essentium Companies lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 158 and accordingly deny them.

**159.   MacNeish intentionally accessed a workstation computer located at the Jabil facility at which MacNeish worked, including on or about September 13, 2017.**

The Essentium Companies lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 159 and accordingly deny them.

**160.   MacNeish exceeded his authorization to access Jabil's file**

**storage system through the workstation by packaging and copying to a non-Jabil USB drive Jabil CAD and other confidential TenX design documents, in violation of Jabil's Information Resource and Acceptable Use Policy and other policies.**

The Essentium Companies are informed and believe, and on that basis admit, that on or about September 13, 2017, MacNeish copied CAD and other data regarding the TenX design to a USB drive and delivered it to Jabil employees who might wish to access that information after he left the employment of Jabil. The Essentium Companies lack knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in paragraph 160 and accordingly deny them.

**161.   MacNeish also exceeded his authorization to access Jabil's file storage system through the laptop by downloading and running the commercial data-wiping software called CCleaner—in violation of Jabil's Information Resource and Acceptable Use Policy and other policies—and permanently destroying Jabil's data.**

The Essentium Companies lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 161 and accordingly deny them.

**162.   MacNeish obtained CAD and other confidential TenX design documents from the workstations and retained the files on the USB hard drive.**

The Essentium Companies deny the allegations contained in paragraph 162.

123683765.2

**163. On or about September 13, 2017, MacNeish resigned his position at Jabil.**

The Essentium Companies admit the allegations contained in paragraph

163.

**164.   MacNeish knew that upon his resignation from Jabil, he was no longer authorized to access Jabil's computer systems for any purpose.**

The Essentium Companies lack knowledge or information sufficient to

form a belief about the truth of the allegations contained in paragraph 164 and

accordingly deny them.

**165.   On or about October 11, 2017, Jabil wrote to MacNeish to demand the return of any Jabil property in his possession and remind him of his obligation not to violate the confidentiality of Jabil's intellectual property.**

The Essentium Companies deny the allegations contained in paragraph

165.

**166.   On or about December 7, 2017, Defendant MacNeish, or someone acting on his behalf or with his permission, intentionally accessed the laptop that Jabil had issued to MacNeish for use within the scope of his employment, including by causing the laptop to interact with "cloud" services.**

The Essentium Companies deny the allegations contained in paragraph

166.

**167. MacNeish, or someone acting on his behalf or with his permission, caused Jabil's laptop to interact with a non-Jabil DropBox account containing Jabil TenX CAD files and other confidential TenX**

design documents—the same or similar to the files transferred to a USB device in or around September 2017.

The Essentium Companies admit that MacNeish used a DropBox account to sync up his Jabil work as a backup he could use while employed at Jabil, including various TenX CAD files and other design documents.  The Essentium Companies deny that MacNeish caused the Jabil devices that he left with other Jabil employees when he ceased working for Jabil to sync up to his Dropbox account after he left Jabil's employ.  The Essentium Companies deny or lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 167 and accordingly deny them.

**168.   MacNeish's, or someone acting on his behalf or with his permission, post-resignation access of the Jabil laptop was without authorization, as Jabil had demanded the return of any company property and never authorized the movement of its files to non-Jabil storage devices or "cloud" services.**

The Essentium Companies deny that MacNeish accessed any Jabil laptop after resigning from Jabil.  The Essentium Companies deny or lack knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in paragraph 168 and accordingly deny them.

**169.   MacNeish, or someone acting on his behalf or with his permission,  obtained and retained Jabil confidential information, TenX CAD files, and other confidential design documents.**

The Essentium Companies admit that MacNeish retained his memory of

TenX CAD files and other design documents he worked on while at Jabil, but deny or lack knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in paragraph 169 and accordingly deny them.

**170. Defendant Gjovik knew or should have known that Jabil maintained an Information Resource and Acceptable Use Policy and other policies that prohibited employees from moving Jabil files to a device (e.g., USB, hard drive, etc.) not registered with Jabil's Information Technology personnel.**

The Essentium Companies lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 170 and accordingly deny them.

**171. Gjovik intentionally accessed the laptop that Jabil had issued to him repeatedly in the months leading up to his departure from Jabil.**

The Essentium Companies admit that Gjovik accessed a Jabil laptop while he was employed by Jabil. The Essentium Companies lack knowledge or information sufficient to form a belief about the truth of any remaining allegations contained in paragraph 170.

**172. On numerous occasions, Gjovik exceeded his authorization to access Jabil's file storage system through the laptop by packaging and copying to a non-Jabil USB drive and to a non-Jabil DropBox account Jabil TenX CAD files and other confidential TenX design documents, in violation of Jabil's Information Resource and Acceptable Use Policy and other policies.**

The Essentium Companies deny the allegations contained in paragraph 172.

**173.   Gjovik also exceeded his authorization to access Jabil's file storage system through the laptop by downloading and running data-destruction software called "Eraser," which permanently destroyed Jabil's data in violation of Jabil's Information Resource and Acceptable Use Policy and other policies.**

The Essentium Companies deny the allegations contained in paragraph 173.

**174.   Gjovik obtained and retained confidential information and files that belong to Jabil.**

The Essentium Companies deny the allegations contained in paragraph 174.

**175.   Defendant Greene knew or should have known that Jabil maintained an Information Resource and Acceptable Use Policy and other policies that prohibited employees from moving Jabil files to a device (e.g., USB, hard drive, etc.) not registered with Jabil's Information Technology personnel.**

The Essentium Companies lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 175 and accordingly deny them.

**176.   Greene was terminated by Jabil on or about October 13, 2017.**

The Essentium Companies admit the allegations contained in paragraph 176.

**177.   Greene knew or should have known that upon his termination from Jabil, he was no longer authorized to access Jabil's computer systems for any purpose.**

The Essentium Companies lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 177 and accordingly deny them.

**178.   Jabil instructed Greene to return all Jabil property, including any computers and computer files in his possession.**

The Essentium Companies lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 178 and accordingly deny them.

**179.   Defendant Greene did not immediately return the laptop that Jabil had issued to Greene for use within the scope of his employment as instructed.**

The Essentium Companies lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 179 and accordingly deny them.

**180.   On or about October 18, 2017, Greene intentionally accessed Jabil's file storage system, including the Outlook account issued to Greene for use within the scope of his employment, by logging onto the Jabil laptop.**

The Essentium Companies lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 180 and accordingly deny them.

**181.   Greene's access of Jabil's stored files was without authorization from Jabil, as Greene was no longer an employee with authorized access at the time.**

The Essentium Companies lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 181 and accordingly deny them.

**182.   Greene copied Jabil's files onto an external USB hard drive in violation of Jabil's policies against the transfer of Jabil's files to non-Jabil storage devices.**

The Essentium Companies lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 182 and accordingly deny them.

**183.   Defendant Essentium is liable for MacNeish's, Gjovik's, and Greene's CFAA violations, as it explicitly or implicitly took part in, encouraged, directed, induced and/or benefitted from MacNeish's, Gjovik's, and Greene's unauthorized access and retention of Jabil's confidential computer files.**

The Essentium Companies deny the allegations contained in paragraph 183.

**184.  Essentium utilized Jabil's confidential computer files to accelerate the development of its own 3D-printing technology based on the information contained in the Jabil computer files misappropriated during MacNeish's, Gjovik's, and Greene's CFAA violations.**

The Essentium Companies deny the allegations contained in paragraph 184.

**185.   Jabil suffered losses from the need to respond to the breach in its data security. Among other things, Jabil has had to retain a computer-forensics expert and divert Jabil's in- house information technology personnel from their normal tasks to determine the nature, manner, and extent of the breach of its confidential computer files.**

The Essentium Companies deny the allegations contained in paragraph

182.

**186.   Jabil also suffered losses from the interruption in its access to the data. Jabil lost income, profits, and business opportunities from the misappropriation, exposure, and deletion of its confidential computer files relating to the unauthorized access by Defendants MacNeish, Gjovik, and Greene.**

The Essentium Companies deny the allegations contained in paragraph

186.

**187.   The total loss to Jabil is well in excess of $5,000.**

The Essentium Companies deny the allegations contained in paragraph

187.

**188.   Jabil is entitled to compensatory damages for its losses relating to its response to the breach in data security and losses suffered from the interruption in service.**

The Essentium Companies deny the allegations contained in paragraph

188.

## COUNT XI – Conversion
### (Against Defendants MacNeish and Essentium)

This Count is not directed against Defendants Teipel or Uffhausen and as

such, no answer is required of them.   Alternatively, Defendants Teipel and Uffhausen generally deny the allegations contained in this Count.

**189.   Jabil incorporates the allegations set forth in paragraphs 1 through 64, above.**

The Essentium Companies incorporate as their answer to paragraph 189 each and every answer they provided to paragraphs 1 through 82 above.

**190.   This is a claim for conversion against Defendant Terry MacNeish and Essentium.**

The Essentium Companies admit that Jabil has self-described this claim as set forth in paragraph 190, but deny the remaining allegations contained in paragraph 190.

**191.   In October 2017, Jabil made a written demand that MacNeish "immediately return" any "documents, records, information (including electronic copies or communications) or other property of Jabil," which included an HP Z-Book 15 laptop that had been issued to Defendant MacNeish.**

The Essentium Companies deny that Jabil made any such demand to Essentium, Inc. or Essentium Materials.   The Essentium Defendants lack sufficient knowledge or information to form a belief about the truth of the remaining allegations contained in paragraph 191 and accordingly deny them.

**192.   Jabil repeatedly reiterated that demand, including at points in time when the demand was, unbeknownst to Jabil, futile because the laptop had already been destroyed.**

The Essentium Companies deny that Jabil made or reiterated any such demand to the Essentium Companies.   The Essentium Companies lack knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in paragraph 192 and accordingly deny them.

**193.   Specifically, MacNeish destroyed the laptop in the Spring of 2019 by discarding it into a dumpster at an Essentium facility. When he did so, he was acting maliciously, within the scope of his employment for Essentium, and for the benefit of Essentium, including with the purpose of destroying evidence of Essentium's misappropriation of trade secrets and other acts in furtherance of the conspiracy pled in this action.**

The Essentium Companies admit that in 2019, MacNeish discarded a laptop that he found in an Essentium facility and believed belonged at one time to Jabil. The Essentium Companies deny the remaining allegations contained in paragraph 193.

**194.   In so doing, MacNeish committed an unauthorized act that permanently deprived Jabil of its property.**

The Essentium Companies lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 194 and accordingly deny them.

**195.   Jabil is entitled to compensatory damages for the loss of its property, to interest, and to punitive damages.**

The Essentium Companies deny the allegations contained in paragraph 195.

## COUNT XII – Civil Conspiracy
## (Against All Defendants)

**196.   Jabil incorporates the allegations set forth in paragraphs 1 through 82, above.**

The Essentium Defendants incorporate as their answer to paragraph 196 each and every answer they provided to paragraphs 1 through 82 above.

**197.   This is a claim for civil conspiracy.**

The Essentium Defendants admit that Jabil has self-described this claim as set forth in paragraph 197, but deny the remaining allegations contained in paragraph 197.

**198.   Beginning by at least 2016 and continuing through the present, Defendants and others, known and unknown, knowingly and willfully conspired among themselves to misappropriate Jabil's trade secrets, breach or induce the breach of current and former contractual obligations to Jabil, and breach or induce the breach of fiduciary duties and duties of loyalty to Jabil, tortiously interfere with Jabil's contractual relationships, convert Jabil property, and violate the Computer Fraud and Abuse Act.**

The Essentium Defendants deny the allegations contained in paragraph 198.

**199.   Defendants acted wantonly and maliciously towards Jabil by conspiring to meet at least the following objectives: to misappropriate Jabil's trade secrets and other highly confidential information, interfere with Jabil's vendor relationships, solicit Jabil's 3D-printing employees under conditions that would breach their contractual, fiduciary, and common law duties to Jabil, violate the Computer Fraud and Abuse Act, and to ultimately reap monetary gains from unlawfully commercializing Jabil's TenX technology and holding it out to be the conspirators' own.**

123683765.2

The Essentium Defendants deny the allegations contained in paragraph 199.

**200. The following overt acts, among others, were taken in furtherance of the conspiracy:**

  **a. Multiple meetings and private communications among Gjovik, Ojeda, MacNeish, Uffhausen, Greene, and Eichele—during their employment at Jabil—at which they developed their plan to abscond with Jabil's trade secrets and other highly confidential information and create or join a Jabil competitor;**

  **b. Concerted efforts by Gjovik, Ojeda, MacNeish, Uffhausen, Greene, and Eichele—during their employment at Jabil—to stockpile trade secrets, other highly confidential information, and Jabil-purchased software and hardware at private residences and on private devices;**

  **c. Concerted efforts by Gjovik, Ojeda, and MacNeish—during and after their employment at Jabil—to interfere with Jabil's vendor relationships;**

  **d. Concerted efforts by Gjovik, Ojeda, and MacNeish—during and after their employment at Jabil—to conceal their plans from Jabil managers and executives, including intentional omissions of material facts by Gjovik at an executive meeting in St. Petersburg in mid-2017, shortly before he left the company;**

  **e. Concerted efforts by Gjovik, MacNeish, and others—during and after their employment at Jabil—to solicit at least two other Jabil 3D-printing employees to join their conspiracy and terminate their employment relationship with Jabil;**

  **f. Essentium's, Essentium Materials', Steven Birdwell's, Gene Birdwell's, Teipel's, and Uffhausen's repeated solicitation of Jabil employees and ongoing misappropriation and misuse of Jabil's TenX trade secrets, notwithstanding Jabil's express notice to the Defendants that the employees and trade secrets were the subject of Commitments of**

Confidentiality.

The Essentium Defendants deny the allegations contained in paragraph 200.

**2.     Defendants' conduct, as perpetrated through the conspiracy, directly and proximately caused substantial damages to Jabil. Their conduct was willful, was malicious, and warrants the imposition of punitive damages as well as all other appropriate relief.**

The Essentium Defendants deny the allegations contained in this second paragraph numbered 2.

<u>**AFFIRMATIVE DEFENSES**</u>

<u>**Allegations Incorporated into Affirmative Defenses**</u>

The Essentium Defendants allege as follows:

1.     The Essentium Defendants incorporate by this reference each affirmative allegation of fact contained in its General Denial above.

2.     On or about July 14, 2016, Jabil authorized Gjovik to lead a project to design a high-speed FFF 3D printer as part of Jabil's overall additive materials strategy, and authorized Ojeda to develop a strategy for Jabil to generate revenue for Jabil from the sale of such a printer.

3.     On or about August 22, 2016, Jabil offered MacNeish employment as a Senior Principal Design Engineer reporting to Gjovik to work on the design of such a printer.  MacNeish had decades of experience in the 3D printing

123683765.2

industry, and had developed numerous industry contacts with vendors and suppliers before joining Jabil.

4.    Jabil knew that it could not directly enter the market of selling 3D printers manufactured under its own name without jeopardizing its business relationships with long-time customers who also sell 3D printers.  Thus, from the inception of this project, Jabil planned to create a separate company that would be owned in part by Jabil, in part by some of the members of the design team, and in part by other investors, to which Jabil would transfer or license any viable intellectual property that it developed along the way.

5.    Jabil authorized Gjovik to expand the design team in early 2017, and had approved a budget he could use to do so.  Jabil, at Gjovik's request, hired Jason Greene and Chad Eichele (who also had decades of design experience and related industry contacts and knowledge) to be part of the Jabil team.

6.    In the spring of 2017, at Ojeda's request, Jabil hired Microflare, Inc. to consult with Jabil and draw up potential business plans and other documents that Jabil might use to try to turn the anticipated 3D printer into a commercially viable revenue stream for Jabil or the stand-alone entity that Jabil would create to use to sell the printer.

7.    Microflare delivered copies of such items to Jabil during that

consultancy, but Microflare, not Jabil, owned any confidential or other content contained in those items (to the extent that any such content was not otherwise publicly available) pursuant to the terms of Jabil's purchase order issued to Microflare.

8.     Jabil never did develop its own 3D printer, much less a printer that that was commercially viable.  At best, it built four prototypes of a "TenX" 3D printer before it stopped funding any continued development of those prototypes and fired what was left of its hardware design team in October 2017.

9.     Those prototypes could not be and never were sold as printers, because they were never commercially viable.

10.    Jabil management elected not to invest the time, money, and other resources needed to advance beyond those four prototypes to a commercialized product.

11.    Jabil management, instead, sought partners interested in licensing the TenX prototype technology so that Jabil could try to recoup some of its investment in the hardware design.

12.    None of Jabil's four prototypes ever included any Jabil "trade secrets," a fact Jabil knew throughout the period from July 2016, when the idea to design a printer first emerged, through October 2017, when Jabil essentially

123683765.2

fired its hardware design team.

13.     Jabil's TenX prototypes were built using existing design features and off-the-shelf components from vendors known in the industry, the use of which did not constitute a trade secret or for that matter anything confidential.

14.     Nobody ever ordered a TenX prototype (much less a TenX printer) from Jabil.

15.     Jabil never produced a final commercially available TenX printer.

16.     Jabil never received even one dollar of revenue from the TenX prototype or through any commercial relationship involving the TenX prototype.

17.     When Jabil abandoned further development of the prototypes, Jabil's own decision rendered those prototypes valueless.

18.     Instead of keeping those prototypes intact so that they could be available as evidence to support its claims that they embodied Jabil owned trade secrets that could be scrutinized by those purchasing printers in the 3D printer market, Jabil's shareholders, Jabil's experts, Defendants experts, the Court, or the jury in this case, Jabil destroyed all four of the TenX prototypes, cannibalizing them for mechanical parts or simply discarding them.

19.     Jabil systemically fails to treat its internal communications and documents as confidential.   Jabil at best pays lip service to the idea of

confidentiality in extracting confidentiality commitments from certain of its employees, but regularly fails to take any steps, much less take the type of reasonable steps required to protect communications and documents as confidential or to protect information in a way so that the information constitutes a protected trade secret.

20.     The communications – business plans, spreadsheets, slide decks, marketing and other like material to which some of the Defendants in this case became privy while working for or as a consultant to Jabil – are prime examples of this.  Most of those items (which Jabil attempts to characterize in this lawsuit as "confidential" or "highly confidential") were never so identified when those communications and documents were being exchanged and shared by Jabil both internally and to outside third parties.  Nor could they have been truthfully identified as confidential or proprietary to Jabil, because most, if not all of those items were compiled using publicly available data, information and images, or shared by Jabil with third parties and potential customers without identifying them to such prospects as confidential and without requiring such prospects to preserve confidentiality under the terms of any non-disclosure agreement and without even following the basic requirements of various non-disclosure agreements required to qualify that information as protected under such

69

agreements..

21.    The Essentium Defendants believe evidence will be uncovered in discovery that Jabil saw this lawsuit as a tool to intimidate its existing employees by making a public display of its prosecution of claims of breach of confidentiality obligations and supposed fiduciary duties against former employees for failing to honor confidentiality commitments, when in truth, Jabil failed to treat as confidential the very materials in question.

## Abrogated duty

22.    The Essentium Defendants incorporate by reference and re-allege each and every allegation contained in paragraphs 1 through 21 above.

23.    Florida law has abrogated the alleged common law duty of loyalty and, as such, any claim that the Essentium Defendants have aided and abetted Defendants Gjovik, MacNeish, Greene, and Eichele in breaching any such non-existent duty fails.

   a. Sections 542.18 and 542.335(1)(a), Fla. Stat., abrogated any common law duty of loyalty to Jabil not to engage in disloyal acts in anticipation of future competition, absent the execution of a written covenant not to compete executed in favor of Jabil that is enforceable under Section 542.335 of the Florida Statutes.

70

b.  Jabil did not enter into a written agreement restricting the right of any of those individuals to compete against Jabil that is enforceable under Sections 542.18 and 542.335, Fla. Stat.

c.  Essentium Defendants cannot have aided and abetted the alleged breach of a non-existent duty, and the portion of the claim asserted against them in Count VIII asserting aiding and abetting the breach of a common law duty of loyalty is barred as a matter of law.

d.  The Essentium Defendants also cannot have conspired concerning the alleged breach of a non-existent duty, and the portion of the claim asserted against them in Count XIII that they conspired to do so is barred as a matter of law.

**Preparation for New Employment.**

24.     The Essentium Defendants incorporate by reference and re-allege each and every allegation contained in paragraphs 1 through 21 above.

25.     The Essentium Defendants had a privilege to make plans for employing MacNeish, Ojeda, Gjovik, Greene and Eichele. It is not actionable that those individuals met with a new employer or discussed future employment amongst themselves.

71

## Pre-disposition.

26.    The Essentium Defendants incorporate by reference and re-allege each and every allegation contained in paragraphs 1 through 21 above.

27.    To the extent Jabil claims the Essentium Defendants tortiously interfered with Jabil's contracts with its former employees, those former employees approached the Essentium Defendants about opportunities. To the extent Jabil suggests there was a breach by those individuals of those contracts, the Essentium Defendants did not cause or tortiously interfere to cause it.

## The Privilege to Compete for Employees.

28.    The Essentium Defendants incorporate by reference and re-allege each and every allegation contained in paragraphs 1 through 21 above.

29.    The Essentium Defendants held, and continue to hold, a privilege to compete against Jabil for employees and otherwise that bars Jabil's tortious interference claim against them alleged in Count IX. Essentium Materials, LLC and, later, Essentium, Inc. had a duty to, and enjoyed a privilege to, compete against Jabil for employees.

30.    Exercising that duty did not interfere with, or cause any of those employees to breach, any enforceable contract they may have had with Jabil; those employees were predisposed—by virtue of Jabil's decision to stop

123683765.2

investing in the development of a 3D printer beyond creating a prototype—to leave Jabil before Essentium Materials, LLC, Teipel, and Uffhausen entertained the idea of having Essentium Materials, LLC or a yet-to-be-formed company hire them. Indeed, sometime in the summer or fall of 2017, Jabil decided to terminate the employment of Ojeda, Gjovik, Greene, and Eichele; none of them had agreed to not compete against Jabil, and all of them had a right to work and protect their own ability to keep gainful employment.

### Jabil's conspiracy claim against Essentium Materials, LLC fails under the intra-corporate conspiracy doctrine.

31.    The Essentium Defendants incorporate by reference and re-allege each and every allegation contained in paragraphs 1 through 21 above.

32.    Count XII fails to the extent that it alleges that the Essentium entities conspired with its employees and agents Teipel, Uffhausen, and MacNeish from and after September 13, 2017, and with Gjovik, Ojeda, Greene, and Eichele after they became employees and agents of Essentium Machines, LLC in October 2017.

33.    Count XII fails against Essentium, Inc. because it did not even exist in 2017 when the alleged acts constituting the conspiracy occurred.

34.    Count XII also fails because all of the alleged predicate claims fail as a matter of fact.

### Waiver or Abandonment of Rights to Assert Violations of Jabil Policies.

35.     The Essentium Defendants incorporate by reference and re-allege each and every allegation contained in paragraphs 1 through 21 above.

36.      For the duration of the lengthy employment of MacNeish and Gjovik by Jabil, Jabil required them to work out of their personal residences or unsecured space in a marine shop open to the general public, instead of providing them with a physically secure environment in which to do so.

37.     Jabil failed to take reasonable steps to secure these generally accessible locations in a way that would be reasonable under the circumstances for protecting trade secrets or confidential information.

38.     Jabil, MacNeish and Gjovik know the importance of maintaining accessible backups of data that they are working on in attempting to invent new technology that they can access quickly in the event of network failures, power blackouts, power surges and the like.  Ojeda also knew of the importance of backing up his data and did so while employed by Jabil.

39.     For the duration of their Jabil employment, Jabil knew or should have known about MacNeish's, Gjovik's and Ojeda's respective practices of backing up the items they worked on their Jabil devices to, in MacNeish's case, his personal Dropbox account, in Gjovik's case to an external device not owned

by Jabil using backup software that Jabil authorized Gjovik to use and reimbursed him for when he purchased it, and in Ojeda's case, to a personal cloud server to which he subscribed.

40.    Jabil also failed to take reasonable steps to set up the workstations and laptops provided by Jabil to MacNeish and Gjovik to prevent them from backing up their devices as they did (either to Dropbox or a connected external hard drive used for backup.

41.    Jabil's practices and course of conduct in this regard were not unique to MacNeish, Gjovik or Ojeda.  The Essentium Defendants believe that discovery and further investigation will demonstrate that other Jabil employees utilized personal Dropbox or other personal cloud services (either to backup their Jabil supplied devices or to effect file transfers to other Jabil employees) and employed other practices that were in direct contradiction to Jabil's stated policies and procedures.

42.    Because of Jabil's use of a program called digital guardian for at least some portion of the time MacNeish worked for Jabil, Jabil was on notice of MacNeish's daily syncing up of his Jabil work product with his personal Dropbox account of any use of an external USB device or hard drive to backup data.

43.    Jabil, however, failed to complain to MacNeish or Gjovik about

their backup practices, much less to notify or even ask him to end that practice.

44.   As a direct and proximate result, Jabil abandoned its information and device usage policies insofar as they might otherwise have been applicable to MacNeish and Gjovik.

## Trade Secret Defenses.

45.   The Essentium Defendants incorporate by reference and re-allege each and every allegation contained in paragraphs 1 through 21 above.

46.   The Essentium Defendants are informed and believe, and believe that discovery will generate evidentiary support for their belief, that:

   a. None of the alleged trade secrets alluded to, but not pled with any specificity, is significantly different from known matters and all such alleged secrets were well within the skill of an experienced engineer.  As such they are not protectable as trade secrets.

   b. The matters that Plaintiff alleges constitute trade secrets are designs and information widely known and used in the 3D Printer industry and in the public domain.  As such, those items are not protectable as trade secrets.

   c. Some or all of the items that Jabil allege constitute trade secrets, if they were ever secret, lost that secrecy prior to the filing of this

action through the conduct, action and words of Jabil, and therefore are not protectable as trade secrets.

d.  Jabil has filed numerous patent applications in connection with 3D printer technology.  To the extent any patent application discloses any material alleged to be a trade secret, Jabil has waived trade secret status of such information and all that it would convey to one of ordinary skill in the art by disclosing such information in a patent application or seeking patent protection for it.

e.  Jabil waived trade secret protection for any information that is capable of discovery through reverse engineering of any Jabil product, or is disclosed or suggested by any information Jabil has made available to third parties or other Jabil personnel without written, enforceable, confidentiality agreements.

f.  To the extent Jabil seeks fees or enhanced damages under the Defend Trade Secrets Act, recovery of such damages is barred at least because the operative documents do not include effective notice provisions or are void as improper restraints of trade or unenforceable restrictive covenants.

g.  When Jabil decided to cease pursuit of a 3D printer program, Jabil

123683765.2

abandoned trade secret protection for information relating to that program at least by acknowledging the information no longer had commercial value to Jabil.  Defendants were entitled to rely on that abandonment as a waiver of Jabil's rights in confidential information it had affirmatively decided not to use in a commercial manner.

h. Information alleged to be trade secrets of Jabil was known to Defendants prior to any disclosure or development by Jabil or learned independently without use of, or access to, any confidential information of Jabil.

i. The Essentium Inc. printer that is the target of Jabil's complaint was developed independent of any trade secrets that belong to Jabil. Essentium used only its own, or publicly available, information, research and development to create its HSE printer.

j. Jabil failed to take reasonable measures to protect the confidentiality of the alleged trade secrets and alleged confidential and proprietary information.

k. Jabil's alleged trade secrets and alleged confidential and propriety information does not have commercial value as a result of being a

78

trade secret.

l. The Essentium Defendants made no use of the allegedly misappropriated trade secrets.

m. Any information or design that Jabil contends is a trade secret that the Essentium Defendants now possess was independently obtained, derived, discovered or developed from past experience, technical knowledge and know-how and/or the public domain.

## **Unclean hands.**

47.     The Essentium Defendants incorporate by reference and re-allege each and every allegation contained in paragraphs 1 through 21 above.

48.     All of Jabil's claims against the Essentium Defendants are barred by the doctrine of unclean hands for the following reasons, among others:

a. Jabil falsely alleges that it developed a best in class FFF 3D printer that it named the TenX. In truth, Jabil knew at the time it made those false allegations that it had *never* developed a working, much less marketable, 3D printer.

b. Instead, in the third quarter of 2017, Jabil abandoned any effort to build a marketable printer. While it had created a partial prototype of a 3D printer, that prototype was never completed by the time

Gjovik, MacNeish, Ojeda, Greene, Eichele and Uffhausen ended their employment or consultancy relationships with Jabil.

c.  In addition, that prototype was never sold or offered for sale to any user.  Jabil self-destroyed whatever potential value that prototype might have had if Jabil had continued to develop it into a viable product when Jabil abandoned development of that printer. Moreover, as Jabil knows, the functions and features utilized in that prototype included functions and features of printer technology that has been available to designers for years.

d.  The Essentium Defendants believe that after a reasonable opportunity for further investigation or discovery, evidentiary support will show that:

   i.  Jabil made those allegations so that it could make it appear to the public and its own shareholders that it had actually created a technology that it had never created.

   ii.  Jabil invested money in pursuing such technology, but its senior executives made a business decision to abandon the technology, the investment, and a financially lucrative business relationship with Essentium Materials.

iii. Upon learning of Essentium, Inc.'s success in introducing the HSE 3D printer to the market in 2019, Jabil's senior executives falsely claimed that the HSE is based upon the technology that Jabil never actually developed, in order to hide the fact from their superiors that those same executives failed to recognize and capitalize on the 2017 opportunity to collaborate with Essentium Materials in the development of a commercially saleable high-speed 3D printer.

e. Jabil "settled" its claims against Ojeda by binding him to a contract under which he is prohibited from communicating with the Defendants without Jabil's permission or without receiving a subpoena under the Federal Rules of Civil Procedure.

f. Jabil's conduct is fraudulent, deceitful, unconscionable, and inequitable, and should bar all of Jabil's claims against the Essentium Defendants under the doctrine of unclean hands.

**Failure to Mitigate.**

49. The Essentium Defendants incorporate by reference and re-allege each and every allegation contained in paragraphs 1 through 21 above.

50. Jabil had a duty to minimize or avoid incurring damages. It failed to

do so here and thus failed to mitigate those damages here. Jabil's failure to mitigate or minimize any alleged damages includes not taking effective steps or measures readily available to Jabil as a multi-billion dollar company to protect information it claims as a trade secret or other confidential proprietary information, including, but not limited to: failing to prevent the alleged trade secret information from being acquired in the first place; failing to take timely and effective steps necessary to retrieve the alleged trade secret information; voluntarily deciding to stop or reduce funding on TenX project and terminate the employment of several members of the TenX team and/or present them with resignation option thereby effectively ending any reasonable chance for Jabil to realize a return on its investment into the TenX program; failure to license or market the TenX prototype and/or voluntarily deciding to end efforts to do so around the time several members of TenX team were terminated by Jabil; failing to timely take effective actions to recoup or minimize actual damages, reasonable royalty, unjust enrichment or any other form of damages.  Jabil has waived or is estopped from now claiming such damages based on its own actions or inactions and/or failure to mitigate any alleged damages.

### *Fabre*.

51.    The Essentium Defendants incorporate by reference and re-allege

each and every allegation contained in paragraphs 1 through 21 above.

52.     Essentium Materials, LLC instructed Greg Ojeda to not breach any obligations or duties he owed to Jabil before he joined Essentium Materials, LLC.

53.     Subsequently, Ojeda represented to Jabil that he violated those obligations and duties and, in return, Jabil dropped him from this lawsuit.

54.     Ojeda's admitted misconduct (of which the Essentium Defendants were unaware), if true, is to blame for all or part of the damages and injury Jabil asserts it has suffered in this case.

## Violation of Non-Compete Statutes

55.     The Essentium Defendants incorporate by reference and re-allege each and every allegation contained in paragraphs 1 through 21 above.

56.     Throughout Jabil's pleading, it suggests that all Defendants engaged in actionable conduct because they met and discussed new employment with a competitor and accepted new employment with a competitor.  Jabil's claims predicated on a theory of unwritten restrictive covenants or non-compete agreements is barred as a matter of Florida and California law. Preventing the individual defendants from using retained knowledge of engineering principles, designs known in the industry, information in the public domain, and independently-developed information would prevent them from continuing their

123683765.2

careers in the 3D printing industry. It also constitutes unfair competition in violation of California law.

### Setoff.

57.     Essentium Defendants are entitled to a setoff and reduction of any amounts claimed or awarded reflecting the amounts paid by any other person or entity relating to Jabil's claims.

### Incorporation by Reference of Co-Defendants' Defenses.

Essentium Defendants incorporate all defenses asserted by their current and future co-defendants in this action as if fully set forth herein to the fullest extent they are applicable to the Essentium Defendants or the claims asserted against the Essentium Defendants.

### DEMAND FOR ATTORNEY'S FEES AND COSTS

The Essentium Defendants seek an award of reasonable attorney's fees and costs pursuant to any entitlement whether by statute, contract, or otherwise.

*/s/ Steven C. Dupré*
Steven C. Dupré
Florida Bar Number 471860
Kevin P. McCoy
Florida Bar Number 36225
D. Matthew Allen
Florida Bar Number 866436
David R. Wright
Florida Bar Number 119453
Darnesha K. Carter

Florida Bar 125658
CARLTON FIELDS, P.A.
Post Office Box 3239
Tampa, Florida 33601
Phone: (813) 223-7000
Fax:      (813) 229-4133
Email:  sdupre@carltonfields.com
            kmccoy@carltonfields.com
            mallen@carltonfields.com
            dwright@carltonfields.com
            dcarter@carltonfields.com

*Attorneys for Defendants*

123683765.2